Good morning. My name is Stephen Tropp and I have the honor of representing Wayne Kramer with respect to an appeal relating to what are essentially very egregious errors made by the trial judge in the underlying case at a pretrial stage during a Rule 56 motion. We ask that this court reverse and remand the case for the following reasons. First and foremost, the court focused entirely on the wrong section of the 1976 Copyright Act. That is 304 AC double I, which in fact took rights and granted them to heirs that lawfully belong to living authors of the works of issue. Secondly, the court entirely ignored another section of Section 3, Chapter 3 of the Copyright Act of 1976, which focuses on termination of transfers. That is 304 C, which was never considered by the court and never looked at by the court, but in fact would grant the heirs the relief they're looking for. Third, the district court relied very heavily on what was then the Southern District of New York's now reversed opinion in Davis v. Blige, which as this court knows the Second Circuit has both reversed and last week the Supreme Court denied cert on the Blige case. So the retroactive license issue in Blige is very, very well settled, at least as far as the Supreme Court is concerned. Well, they denied cert. They did deny cert. And it's a Second Circuit case. It could be waiting for a split, too. That is true. If we went the other way. But let me just procedurally ask you the question. If the district court said that your client was stopped from asserting copyright infringement in this case, if we agree with the district court on that, do the other issues just fall by the wayside? They don't fall by the wayside, Judge Callahan, for the simple reason that the errors that occurred at the summary judgment stage essentially dismissed 14 out of 15 copyright-related claims, both primary and secondary claims, which would have changed the entire texture of the trial. As opposed to trying a case on a mere single de minimis work that was solely authored by my client, Wayne Kramer, they would have in fact had to try a case on 15 copyrights and the claims related thereto that would have changed the relative equities of the parties dramatically at trial. Could you explain how that would affect the court's equitable estoppel analysis? I didn't see in your briefs an explanation of how that would have affected the four prongs or the … Well, the equitable estoppel argument is essentially one of a balancing of the equities. When the court was faced at trial, the court addressed these legal issues, which were before the court de novo at summary judgment. By the time the case got to trial, there was a balance of the equities. The equities on my client's side had been reduced as a result of the legal issues to a single copyright claim involving a relatively de minimis work relative to the entire documentary on the MC-5 that was at issue before the court. I don't really see the balancing of the equities for an equitable estoppel analysis. The court was looking at whether your client knew what the facts were that he intended his conduct to be relied upon and that the appellees were ignorant of the facts and they relied on it to their detriment. How is that a balancing of the equities? Well, it is a balancing of the equities in the sense that he … Well, first of all, there's a relatively muddled trial record, I have to admit, in the sense that there were originally two films involved. It's relatively impossible to tell from reading the trial record where the equitable estoppel begins, where his analysis of the copyright claim, the single remaining copyright claim, relies, and where the two films ultimately came out relative to the single copyright claim. Had all 15 copyrights been before the court as they properly should have been based on the legal decisions made at the Rule 56 stage, it is entirely probable. Otherwise, we engage in a litany of what-ifs. The equitable estoppel argument that was raised and ultimately resulted in the judgment against my client at trial was only after the judge had made these egregious legal errors at summary judgment. He had not done so prior to that. That testimony was adduced at trial. The trial would have taken on an entirely different complexion had all 15 claims existed. It is impossible for this court, in our understanding, to second-guess what would have happened at trial had all 15 MC5 compositions remained, as both Blige, 304C, 304A seem to require, would have then looked at the balancing of equities in the equitable estoppel claim relative to 15 copyright claims, which in and of themselves comprise the heart and soul of defendants. Would your argument be stronger if this had been a jury trial? Because isn't it the same judge that did the summary judgment that did the bench trial? It is the same judge who did it. I'm not sure it would have made a difference with respect to a jury trial. But obviously, having been a trial judge, the judge knew of the 14 other ones when the judge is deciding the one in a bench trial. It's difficult, Judge Gallagher, for me to speculate, not having been trial counsel below. I was brought in on the appeal of this matter, but I must say that the equitable estoppel, essentially the factual argument is based on those equitable estoppels. And by the way, there is a de novo issue relative to reasonable reliance here. In the bench trial, doesn't the court find that Kramer wanted the film completed because he believed it might bring renewed interest to the MC5 and that such a film could be financially rewarding to him, that he, therefore, he continued to encourage Thomas and Legler as they worked on the film, and they spent a substantial amount of money in that. Didn't the court find that? The court found that. But let's not forget the fact that the court at the summary judgment stage dismissed 15 claims that arose out of a Warner Chapel exclusive license. Fifteen or fourteen? Fourteen claims, excuse me, copyright-related claims that arose out of Warner Chapel's exclusive license that the heirs themselves had relied on right up until trial. The heirs themselves had received royalty checks, had received revenues from these license agreements. They had never once objected to Warner Chapel's exclusive license in administering these copyrights until this case then went to trial, and all of a sudden it became, again, this litany of sort of what if. Now, whether or not the trial judge could have, in fact, ignored the fact that he had dismissed 14 copyrights and put that out of his mind when he tried the case, I think, is, again, one of the compelling reasons this case needs to go back for a new trial. On Blige alone. You keep saying complexion, and you keep saying 14 versus 1. What would the change of complexion actually have been in terms of what your client did and did not do? What would have been the change of complexion? It would not have not only changed what my client did or did not do, but it would have changed the nature of what the defendants did and did not do, which is directly relevant to the equitable estoppel argument. You said it would change the complexion. It would change the complexion relative to the defendants' conduct. He said not only would it change the complexion of what my client did, and my question is how? It would have changed the complexion with respect to what my client did because it would have shown that my client with respect to his relationship with the parties on all 15 claims. Now, I know that I believe that this court has had a copy of the documentary submitted as part of the record here. The 15 copyrights at issue, the 15 compositions at issue, make up the entire documentary. There is absolutely no doubt that the relationship between Warner Chappell and the ultimate denial of the synchronization licenses relative to this would have been adduced to trial. But how would that change the complexion of your client? How would your client have behaved differently? First of all, my client had the right through an assignment from Warner Chappell to either grant or deny the right to use the film, to right to use the compositions in the documentary. The fact of the matter is that it would have shifted the focus at trial far more to the defendants' conduct. While there is evidence as to my client's conduct, there is also evidence as to the defendants' conduct which never reached the trial court because of these errors at the summary judgment state. And how would that affect the equitable estoppel analysis? Would it mean that the defendants knew the true facts that your client wasn't intending to license? Without a doubt. There was significant evidence presented throughout the case that not only did they know the first, the Warner Chappell license agreement during its renewal window was never objected to, was never challenged, nothing was ever done by the heirs of the deceased band members, the three living band members continued. Warner Chappell's license was then perfected as opposed to an expectancy interest under Albin, was perfected by 1998. They continued to receive all royalty payments and cash all royalty checks. They requested synchronization licenses from Warner Chappell and from my client throughout with respect to all 15 compositions. They constantly acted consistent with the fact that all 15 compositions were necessary and were held by Warner Chappell throughout this entire litigation. It wasn't until there was a dispute between the parties that arose prior to the trial that they ultimately, and during trial, that they went back and went to the heirs. It's the first time the heirs ever got involved and the heirs then granted this illegal retroactive license under Blige. So the fact of the matter is that there is virtually nothing that we can do to figure out what would have been adduced relative to the evidence at trial had the defendant's conduct been the focus of the testimony on all 15 of these claims. For example, Blige alone, let's take, for example, the retroactive license that gave the heirs the rights to begin with. One of the things that strikes me about the core holding, and I agree that defense counsel is going to argue that Blige is probably overbroad and the facts of that case are extremely broad, but there's a very narrow holding with respect to retroactive licenses. Those retroactive licenses, imagine, for example, we have criminal provisions in the Copyright Act. Imagine, for example, that you have the ability of non-party, non-governmental entities having the ability to eviscerate claims that would belong exclusively in the discretion of the U.S. Attorney to prosecute or non-prosecute. We're not suggesting that these copyright violations rise to the level of criminal provisions, but not following Blige, in fact, leads to that result. I still think if we don't buy your argument that the summary judgment was wrongfully decided, and if we don't buy, if we think that the court correctly decided equitable estoppel, I still think that we don't get to Blige. Am I wrong or right? I know you don't want me to be there, and I'm not saying that I am, but assuming that that's how I decided it. Well, I think there's another point that's important to make here, and that is the misconstruction of joint authorship that permeated this case. No less an authority than Professor Goldstein in his treatise recognizes that joint authors, that is, heirs, are not all equal. And he drew an analogy, for example, to contract and to trust law, where he said that you can have both beneficial heirs and those with legal title, or beneficial owners and those owners with legal title. The fact of the matter here is that these heirs held nothing more than beneficial title, which they reaped the benefits up through the trial and continue to do so today. But the statute doesn't say that. The legal title was held by Warner Chapel. But the statute doesn't say that, right? I mean, you rely on the Selznick case, but that is referring to an earlier version of the statute, which required registration. Selznick v. Turner was the pre-'98 amendment that required registration. But by and large, if you look at joint authorship under the statute as a whole, under Section 101 joint authors are defined. Nowhere else in the statute are the rights of joint authors or the relative equities between joint authors defined. It is purely a matter of common law and of custom and practice with respect to joint authorship. For example, the fact that joint authors can't sue each other for infringement is not a substantive part of either the 1909 Act or the 1976 Act. The fact that joint authors have an equitable right. You're down to a minute. Do you want to save a minute for rebuttal? I would. If I could just quickly finish the thought, and I'll take that minute. Well, you might not have that minute then. Thank you very much. Good morning. Good morning, Your Honors. May it please the Court. My name is Vincent Cox. I represent the defendants in this case. These are exceptionally sad facts for a copyright case. If the Book of Job had a chapter on copyright licensing, it would have facts similar to this case. My clients worked for eight years to create a film. They scrupulously attempted to comply with copyright law in every instance. They obtained festival licenses. They undertook to create a film. Incidentally, the film does not consist of merely these 15 musical compositions. The film, which is in the record, and if you do take an opportunity to see it, you'll observe, it's about the character arc of the individual members of the band. It's a story of redemption in which they overcame immaturity and bad decisions and egotism and drug use and made something of themselves, made something of their lives, and now have a legacy of music that is finding its way to the next generation. That's what the film is about. It's not just about putting these old compositions before the audience. That's a part of it. It's an important part of it. It does make it unmarketable to remove those compositions, and that's why it was such a javelin through the heart to learn from Warner Chappell on February 17, 2004, that no license would be forthcoming after they had entered into DVD licenses for distribution, after they had entered into a theatrical distribution license, after they had basically put themselves in a position of utmost vulnerability. Well, and so obviously your book of Job is to the fact that they never were able to financially benefit from all this work that they did over that period of time. But in terms of the analysis here, obviously this isn't going to change that part of history. We're looking at what the summary judgment in the bench trial and the issues that came up there. Correct, Your Honor. And paragraph 25 through 29 of the findings of fact that Judge Guilford wrote after the court trial make it clear that the estoppel that he's found is not limited to one-fifteenth of the motion picture. It's not limited to only the composition Poison. All of the facts that he relies upon to find an estoppel apply across the board to the broad license that my clients requested and expected from Warner Chappell with respect to all 15 of the compositions. The same 15 compositions that have been the subject of festival licenses that are in the record were going to be the subject of a broad license that they were seeking. So there is absolutely no factual distinction between the composition Poison and the other 14 compositions. Other than that, alone among those compositions, the sole author of that composition was the Plaintiff Wayne Kramer. And therefore, the heirs of Smith and Derminer had absolutely no right to convey a license retroactively or prospectively for that composition. If we got past the equitable estoppel issue and we're looking at the Davis v. Blige issue, now Davis v. Blige relied on New York, Tenzing-Hammond law. Is California law the same? Would we be banned if we followed Davis v. Blige to reach the same result that one co-tenant can't, in effect, settle the claims to the detriment of other co-tenants? I think that the binding law really would be the Ninth Circuit law that existed prior to the Copyright Act of 1976. In passing the act, the legislative history made it clear that Congress believed that there was no enactment necessary to deal with the rights of co-owners because that had already been resolved to Congress's satisfaction through Ninth Circuit decisions like Piantadosi and Meredith. And so those decisions essentially were understood by Congress to provide the background fabric here. And the Second Circuit simply had no right to overrule the Ninth Circuit's holdings. And those are the holdings that ultimately became a part of the fabric of post-1976 copyright. Well, I don't quite understand what you're saying. The Second Circuit, we're not bound by each other. That's correct, Your Honor. I don't think Blige is defective because it didn't pay attention to Ninth Circuit law. But when we decide, I don't think we have to follow Blige. That's correct. I agree, Your Honor. But if we get to that issue, I understood Judge Acuda to say, would we reach the same result because Blige, the analysis included New York law, and wouldn't we look to our law? I believe that you would look to your law, Your Honor, the law in the Ninth Circuit. I do think that federal law governs the rights of co-owners. It is not a matter of state law. I think it would be chaotic if you had 50 separate rules around the country for what the rights are between co-owners of copyright. It does seem to me that it is an instance in which federal policy governs. I mean, there are cases basically that say that the federal common law fills in the gaps in copyright law. SOS versus payday is one of them. Okay, but Blige was decided based on state law, right? No, I believe it was decided based on federal law, Your Honor. That's my reading of it. It drew analogies from state law, but the analogies that it drew were from New York, right? Were from New York, that's correct, but those analogies were inapposite to the situation. The thing that they should have been looking at first and foremost was the congressional policy involved in Section 201D of the Copyright Act that all joint owners of copyright are to have equal rights, and those equal rights include both a right to license prospectively and a right to grant releases for acts that have occurred in the past. And whether you call the document that deals with acts in the past a release or a retroactive license, it's functionally identical. Isn't the transfer of ownership as defined, doesn't that exclude non-exclusive licenses so that that's not actually covered by 201? So 17 U.S.C. 101. The formality requirements, that's right, it is not a transfer. The transfer of copyright ownership does not include a non-exclusive license. I wasn't sure. It's an incident of ownership, though. The policy that's embodied in Section 201D seems to me to embody the notion that incidents of ownership, such as the right to grant a non-exclusive license, should be equal between all copyright owners. But that seems to be foreclosed by, why isn't that foreclosed by 101, that defines transfer of copyright ownership as not including a non-exclusive license? Because the right to transfer a non-exclusive license is an incident of the transferor's ownership. It's an incident of ownership by the transferor, and 201D is about giving rights to the owner of the copyright. Clearly, every owner of the copyright is entitled to equal treatment. There should not be unequal treatment such that one copyright owner can block others. I think that was Davis v. Blige's analysis, was that if you could do a retroactive license when a suit was pending so that somebody had accrued an infringement claim, then you were blocking the damages that that tenant was in common had incurred. I mean, that's essentially what Blige said, and why the hell that was not an entitlement that a tenant in common would have. Well, any one copyright owner is entitled to bring an action. Mr. Kramer can issue a release, can bring an action to judgment, and it will bind all copyright owners. When an owner of a copyright brings a copyright claim, he can then, the judgment is conclusive as to all owners of the copyright. So it used to be, I mean, this issue only arose when the Joinder Rules were changed and when the 76 Act was passed to make it clear that not all owners of a copyright were indispensable parties. That's what gave rise to this issue, really, because there wasn't a body of case law dealing with how you handle situations in which only one of several joint owners is a plaintiff. But the equal right that Mr. Kramer has to prosecute a claim to judgment is paralleled by the right of the non-litigant owners to issue releases while the case is ongoing. It's the nature of a tenancy in common, that all tenants in common have an equal right to the entirety. And Congress wanted there to be a tenancy in common, as explained in Otto v. Rees and other Ninth Circuit cases, Marl v. Smashing Pumpkins. But in fact, at least under state law, a tenant may not settle a claim for damages to the common property without the co-tenant's consent. So to the extent it's analogous to tenant in common law, I don't know, I only looked at California and New York law, it would seem that Davis v. Blasch got it right. Well, tenancy in common, as it's construed by the federal courts, in cases like Otto v. Rees and Childress v. Dyer and the other cases that validate the retroactive licensing that we cited in our brief, that interprets it oppositely. It says that you can. One joint tenant in common is entitled to resolve the entire case. Well, then it just seems that you're creating from a policy standpoint, if the tenants in common don't agree, then the first one just races to do something and everyone's bound by it. I mean, they essentially then have no right. That's right, but it furthers the purposes of the Copyright Act, which is to promote the distribution of copyrighted works. The tenant in common who wants to see the work distributed, who wants to see the work made available to the public, that tenant in common takes precedence over the tenant in common who wants to prevent its use. Because essentially, if the plaintiffs succeed, you're going to see the Smith and Derminer family are not going to have their predecessors' works available to the public at nearly the same level or nearly the same way. This is the only way that they have to see to it that their works are made available to the public. So the Copyright Act has a built-in preference for dissemination and distribution and the preparation of derivative works. That furthers the purposes of the Copyright Act. And I don't believe that it should be a matter of individual state definitions of tenancy in common. So it sort of furthers the Copyright Act, but it takes away the property right? That's right, it does, Your Honor. That a tenant in common would have. Except that as a tenant in common, as we argue under federal law, and I believe the Ninth Circuit has found in Otto v. Rees and Childress v. Dyer, the joint tenant does have a right to issue a license even if his joint tenant objects. That's pre-existing law. There's not really a question as to whether that can be done prospectively. Nobody that I know of has raised any question about that. Did any of the cases you cite, and I may have missed this, arise in the same context as Davis v. Blige where there was a pending copyright infringement case and a co-tenant then issued a retroactive license to the defendant? The only cases that we cited were district court cases in which that had occurred. The Lone Wolf McQuaid case is one of them, Your Honor. This has not risen at the circuit level before Davis v. Blige and before this case. On the attorney's fees, Your Honor, I would like to suggest that this is an instance in which the court below applied the wrong legal standard in failing to look at whether or not the successful defense of the action furthered the purposes of the Act, rather than the issue of whether an award of fees would further the purpose of the Act. That's the metaphor. Is that a distinction without a difference? It might seem that way, except that in this case. Well, I had to ask that. Yeah. If it is a distinction without a difference, then there would be no reason to remand, right? Well, here the successful defense of the case. There is a distinction because the defense of the case makes the work available for potential distribution. That's how the successful defense of the case furthers the purpose of the Act. The award of fees, taking money from Mr. Kramer, may not further the purpose of the Act, but giving money to people who have gone into their pocket to see to it that a work is made available to the public is the result of the successful defense, and that did further the purposes of the Act. So that is the distinction that we would draw. And in this case, we think it is a distinction with a difference. The purposes of the Act as you state, what language are you referring to? Article 1, Section 8, to promote arts and sciences. It's a broad sort of notion that the copyright act exists to promote the development of the creative arts. The second factor of motivation. The court found that there was no evidence of improper motivation, and that unfortunately flies in the face of the court's finding of the estoppel here. The only motivation that has put forth in any of the briefing that I've seen, either at the district court or here, is that Mr. Kramer felt he was protecting his copyrights by suing our clients. That is disingenuous. If he actually had an economic motivation, if he had an economic motivation, he would have sued the theatrical distributor, he would have sued the theaters. Those people had some money. What my clients had was a copyright that he wanted to take from them, and he was using the Copyright Act, misusing the Copyright Act, to achieve that result. Thank you, Your Honor. Thank you for your argument. In the extremely limited time that I have remaining, I will make two very quick points. On the joint authorship issue. That's really sad. You're making that seem really sad, but I don't think the students are buying it. On the joint authorship issue, with respect to the equality of tenants in common, there is both an inherent logic that, again, Professor Goldstein points out, about treating them differently with respect to beneficial versus legal title. It doesn't change the fact that they share in the proceeds. What Blige did, I think, was recognize the fact that you cannot eviscerate existing claims without the consent of co-authors, which was long overdue. Secondly, there is some guidance in the Act of 76, and that's in Section 304C, and subsequently in Section 203, which does create a hierarchy of different interests in heirs and in copyright claimants at the time of termination of transfers. Recall that Section 301 deals with just durational parity. 304C is what goes back to the Act of 1831 and deals with the issue of termination of transfers, and the heirs are, in fact, treated differently, both as beneficial and as legal title holders. Just one quick point on the attorney's fees matter. It seems to me that the Fogarty factors, which have been the dominant provision relative to the award, the discretionary award of attorney's fees, in this case is well settled. Lotus v. Borland in the First Circuit, cases in almost every circuit since, have said when there are genuine issues which go to the heart of interpretation of the Copyright Act, as Mr. Cox indicated, Article I, Section 8, Clause 8, and its interpretive components, the award of fees and the discretion to award fees is not necessarily appropriate, and I would suggest that the very fact that we're here talking about extremely intricate issues of first impression under copyright strongly militates against the award of fees. Thank you, Your Honor. All right, thank you both for your argument in this case, and the matter will stand submitted.
judges: Fernandez, Callahan, Ikuta